[Cite as *In re Adoption of M.M.*, 2023-Ohio-397.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
HURON COUNTY

In re Adoption of M.M.

Court of Appeals No.  H-22-016

Trial Court No.  AD0202200007

**DECISION AND JUDGMENT**

Decided:  February 10, 2023

* * * * *

Brian J. Lamb, for appellee.

Anthony J. Richardson, II, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} Appellant, B.J., appeals the September 30, 2022 judgment of the Huron County Probate Court finding that his consent to the adoption of his natural child, M.M.,[1] by appellee, D.M., was not required.  For the following reasons, we affirm.

---

[1] We note that the parties refer to the child as "M.M." in their briefing, which is consistent with the case caption herein, *In re Adoption of M.J.M*.  It appears, however, that the child's current initials are M.J.J., as the request to change the child's legal name to one with the initials M.J.M. remains pending in the probate court.  Nonetheless, we

## I. Background and Facts

{¶ 2} M.M. was born on May 27, 2011, to M.M. ("mother") and B.J. ("father"). Mother and father were never married. Mother is married to D.M. ("stepfather"), the petitioner herein. Father is married to C.J., with whom he shares one daughter, A.J. Father and C.J. do not have custody of their daughter—instead, A.J. has been living with mother, stepfather, and her half-brother, M.M., since 2018. Father and C.J. have engaged in court-ordered visitation with A.J. during that time.

{¶ 3} On April 13, 2022, stepfather filed a petition to adopt M.M., with mother's express consent. The petition alleged that father's consent was not required because he had "failed without justifiable cause to provide more than de minimis contact with the minor for a period of at least one year immediately preceding the filing of the adoption petition" and "failed without justifiable cause to provide for the maintenance and support of the minor as required by law or judicial decree for a period of at least one year immediately preceding the filing of the adoption petition."

{¶ 4} By order dated June 27, 2022, the probate court bifurcated the issues of father's consent and whether adoption would be in the best interests of the child, and set a hearing for September 2, 2022, to determine whether father had waived his consent to the adoption.

will refer to the child as M.M. to be consistent with the case caption and the parties' briefing.

2.

{¶ 5} At the beginning of the September 2 evidentiary hearing, stepfather's attorney clarified that because "[t]here has been some child support payments made within the last year," stepfather intended to proceed solely on the theory that father failed without justifiable cause to provide more than de minimis contact with M.M. during the relevant one-year time period. The following witnesses testified at the hearing: mother, stepfather, father, his wife C.J., and his grandmother, S.S.

{¶ 6} Mother testified that she is the biological mother of M.M., and she is married to stepfather. Mother and stepfather live with four children in their household— their two biological children plus M.M. and A.J., the biological daughter of father and his wife, C.J. Father and mother were never married and never lived together after she had M.M.

{¶ 7} Mother says that father's involvement with M.M. has been very "inconsistent" since M.M. was born, meaning that he "could be there for a month and then two months not be there," and "he doesn't really visit [M.M.] or really make calls to [M.M.]" In 2012—when M.M. was one year old—father served some time in jail, and wrote a letter to mother from jail stating that he was prepared to "sign" over his "rights" as M.M.'s father.[2] Mother claimed that father changed his mind when he learned of the

---

[2] Father repeatedly objected to any testimony or evidence regarding occurrences outside the relevant one-year time period preceding the adoption petition—i.e., April 13, 2021 to April 13, 2022. The court overruled these objections because it found that "a history of evidence of a relationship between the parties" is relevant to the "subjective" element of "justifiable cause." Indeed, a probate court is authorized to consider evidence outside the one-year statutory period when determining whether parental consent is required under

3.

adoption petition. Mother testified that she has never denied father any request to visit with M.M., but she acknowledged that she has been giving M.M. the choice of whether to "go" with father since he was ten years old. She said that even though father regularly contacts her for visits with A.J., he only contacts her regarding M.M. on his birthday—May 27—every year.

{¶ 8} Mother identified a screen shot of all text messages that she had with father between August 21, 2020 and April 11, 2022. There is a single text message from father on May 27, 2021 regarding M.M. in which he states, "[c]an I talk to [M.M.] today and tell him happy birthday[?]" Mother did not respond to the text, but she testified that she "gave [M.M.] an option" to speak with his father, but he did not have a conversation with his dad that day.

{¶ 9} Mother confirmed that—other than the birthday text on May 27, 2021—father did not text, call, or message mother regarding M.M. at any other time during the relevant one-year period preceding the adoption petition. Father knows where she lives, and knows her phone number. Mother is also available for contact on social media.

{¶ 10} Father does, however, regularly contact mother regarding visitation with his biological daughter A.J., who has been in the custody of mother and stepfather since 2018. After A.J. was initially placed in mother's home, father would visit A.J. on a weekly basis at mother's home—and, given that M.M. also lived there, father would see

R.C. 3107.07(A). *See In re Petition for Adoption of Z.H.*, 6th Dist. Williams No. WM-22-002, 2022-Ohio-3926, ¶ 46.

4.

M.M. during those visits. Father and C.J. would also pick up A.J. for visits, and they would occasionally take M.M. for visits along with A.J. Mother, however, does not remember how long that arrangement lasted, but she does remember that M.M. spent a week with father in 2018. Mother testified that at a certain point, father began picking up A.J. but not M.M. When asked if she knew why M.M. stopped going on these visits, she said, "I was not asked for [M.M.]"

{¶ 11} Since 2021, the parties have exchanged custody of A.J. every other weekend at the sheriff's station. Mother estimates that there were approximately five to ten exchanges of A.J. at the sheriff's station between April 2021 and April 2022. Mother says that father never asked to speak with or visit M.M. during any of their exchanges at the sheriff's station, although father did mention M.M. during a conversation in April 2022. According to mother, father told her that he was putting A.J. into a demolition derby and "if [M.M.] wanted to go, he could go, but he did not ask if [M.M.] could go, he just made a statement that [M.M.] could go." She also believes that it was during this same conversation that father was informed that stepfather had just filed a petition to adopt M.M.

{¶ 12} Stepfather testified next. He said that he is not aware of any requests by father to see M.M. between April 13, 2021 and April 13, 2022, nor is he aware of any gifts or cards or correspondence from father to M.M. during that same time period.

{¶ 13} Stepfather said that he ran into father at a demolition derby in Norwalk in October 2021, and they had a conversation. During that conversation, father may have

commented something to the effect of "where is [M.M.]?" He did not ask to visit or speak with M.M.

{¶ 14} Stepfather ran into father again at WalMart in Norwalk, sometime in January or February of 2022. Stepfather does not remember the specifics of that interaction other than saying that the "majority" of conversations that he has with father are along the lines of, "I want to be a father, I want to step up, I want to be a dad," but nothing ever comes of it after that. Whenever father would say such things to him, stepfather would tell him to contact mother. Stepfather said that his interactions with father "may have" come up in conversation with M.M., and he and mother would have let M.M. decide if he wanted to do anything. Stepfather said that father has told him that he wants to "step up" whenever he runs into father out in public, but "that's pretty much the end of it because this has been going on for ten years that he says that he wants to step up and be a dad; and I mean, nothing is ever done about it."

{¶ 15} Stepfather said that sometime in May or June 2022—he remembers "for certain" that this conversation was "within a month or two after the petition for adoption was filed"—he had a conversation with father while the parties were exchanging custody of A.J. at the sheriff's station. Mother was not present for this conversation because she was pregnant and did not want to exit the car. Father made a general statement that he wanted to be a father to M.M. and "step[] up" but the parameters of what he wanted to do were never "established." Father did not actually ask to visit or speak with M.M. at that

6.

time.  Stepfather said that he had maybe two "similar" interactions with father during exchanges of A.J. at the sheriff's station, but nothing ever came of it.

{¶ 16} Father's wife, C.J., testified next.   She said that sometime "between 2020 and 2021," she and father attempted to get M.M. to attend A.J.'s birthday party at the Comfort Inn.  They asked mother if M.M.—who was sitting in the backseat of the car when mother dropped off A.J. at the party—could stay to "hang out" and go swimming and have cake at the party.  Mother told them that M.M. was going fishing but "we could take him at a different time shopping, but with them" and father said he "didn't want to do that, he just wanted to get his son and spend time with him."

{¶ 17} C.J. said that mother and stepfather were always "keeping" M.M. from father, but when asked for specific examples, she said "I can't really think of one right off the top of my head."  C.J. testified that she and S.S., father's grandmother, handled the majority of A.J.'s custody exchanges at the sheriff's station, and father was "not there with the pickups too often."  She said that during a "couple" of these exchanges, "we" — meaning she and S.S.—asked to have M.M. for "like an hour, two hours at most" and mother said "well [M.M.] don't want to go."  Besides these conversations, she admitted that she is not aware of any other efforts by father to get visitation with M.M.—although she did hear father ask stepfather "once" to visit M.M. during one of the custody exchanges, but she did not give any details on that interaction.  She said that it has "been a while" since she asked mother to have M.M. for a few hours because she would always "get a no."  She also thinks she discussed with father around August 2021 if they could

7.

get M.M. to "get the kids together" and father responded by saying "if she lets you." C.J. said that she used to text mother for visits with M.M., but it has been "at least a year" since she has asked mother for M.M.

{¶ 18} S.S., father's grandmother, also testified at the hearing. Father currently lives with S.S., and she supervises visitations with A.J. She says that A.J.'s custody exchanges have been at the sheriff's station for more than a year. S.S. testified that it is usually her and C.J. at the custody exchanges, but father has been there for a "few" of them. She also said that M.M. was in the backseat of the car for some of these exchanges, and C.J. would occasionally "chit chat" with M.M. while she was getting A.J. out of the car.

{¶ 19} S.S. "can't recall" if she ever heard C.J. ask mother for visitation with M.M. during these exchanges. Father would tell her that he had made unsuccessful attempts to see M.M., but she did not provide any specifics. She said that M.M. stayed with her and father for about a week several years ago, and she also discussed an in-person visit between M.M. and father on Father's Day when M.M. was nine years old (i.e., 2020).

{¶ 20} Father was the last witness to testify at the hearing. Father was present at M.M.'s birth and saw him "every chance [he] could get" in the months that followed, but it became harder to see M.M. after he and mother separated, when M.M. was one year old. Father was in jail between August 19, 2012 and December 19, 2012, and had "severe depression" when he wrote the letter to mother from jail stating that he wanted to

8.

sign over his rights as M.M.'s father. He and mother wrote additional letters back and forth, discussing getting married and trying to have a family for their son. But when he got out of jail, he learned that mother and stepfather had gotten together.

{¶ 21} Father said that between 2012 and 2018, he would call mother to see M.M. and she would say "I have to talk to [stepfather]" and then not get back to him. He claims that this happened "every few months" and "has been going on for years." The last time he visited with his son was Father's Day 2020, when he had M.M. and A.J. together for four hours. He denied mother's claim that he only reached out on M.M.'s birthday, and claims that there were other times that his phone was dead and he used his wife's phone to try "to talk to him." Father also claimed that he has tried calling mother, and has left voicemails and texts, but she never responded—although he did not provide a specific timeframe for these efforts.

{¶ 22} Father saw stepfather on October 2, 2021 at the fall demolition derby in Norwalk. He went up to stepfather and asked where M.M. was, and stepfather told him that M.M. was at home. Father then told stepfather, "[y]ou know, I want to see him. Even if it's just me, you, and him, go do something, you know, I just want to spend time with my son." Stepfather told him that "we would talk about it later." Father says he asked stepfather for his phone number—and claims that he has asked "multiple times" for stepfather's number, to no avail. Father didn't tell stepfather exactly what he wanted to do with M.M. because he was just "leav[ing] it up to [stepfather]" to decide what they could do.

9.

{¶ 23} Father saw stepfather "in public" again in November or December 2021. Father told him that he wanted to see M.M., and asked him what M.M. wanted for Christmas. Stepfather told him that "he would ask him, get a hold of me, him, and [mother]. I never heard from him."

{¶ 24} Father ran into stepfather again in January or February 2022 at WalMart. Father asked him how M.M. and A.J. were doing, said "you know, I would like to spend time with my son," and he suggested (again) that he, stepfather, and M.M. get together. He then asked stepfather to text him about it since he didn't have stepfather's number, and he knew that stepfather could get his phone number from mother. Stepfather said that he would "get a hold of [father]" but he never did.

{¶ 25} Father never followed up after these three conversations with stepfather because he didn't have stepfather's cell phone number, and he didn't call mother because she never answered his calls. Father didn't try to go to mother's house to speak with them because he thinks they would have called the police and he didn't want to have a confrontation in front of M.M. and A.J.

{¶ 26} Father says the last time he saw M.M. was around March 2022 when he was sitting in the backseat during one of the pickups for A.J. at the sheriff's station. Father was present for approximately fifteen custody exchanges for A.J. over the years, and M.M. was present for "a few" of them. He said that mother would glance over her shoulder and look at M.M. sitting in the back of the vehicle, and say, "he don't want to speak to you." Father also says that he approached stepfather about M.M. "a handful of

10.

times" during A.J.'s custody exchanges.  He said that the "last time" they had a conversation about M.M. was before he found out about the adoption papers, and he said he would enjoy doing "anything" with M.M.—either on his own or with mother and stepfather—and asked them to "get a hold of me" but he "[n]ever heard anything."

{¶ 27} When asked why he never filed for visitation rights with M.M., he claimed that he doesn't "think like normal people" because he has had memory issues ever since he got a "very serious concussion" in July 2012.  But, he admitted that he is employed and does not have a medical diagnosis and is not disabled.   Father did not file for visitation rights with M.M. because he thought he had to file in Wood County because that is where M.M. was born, and he doesn't have the money to drive to Wood County and file anything.

{¶ 28} The probate court issued its decision on September 30, 2022.  The probate court concluded that there was clear and convincing evidence that father did not have more than de minimis contact during the one-year period preceding the filing of the adoption petition.  The court concluded that there was clear and convincing evidence that "[father] has had no in-person contact with [M.M.] since 2018 during a visit with [A.J.] at [mother's] home," and any "contact" between father and M.J. during some visitation exchanges for A.J. "was no more than de minimis."

{¶ 29} Regarding justifiable cause, the probate court noted that although father had inquired about seeing M.M. on a few occasions during the relevant period, "[a] tepid response to an occasional request to see a child does not rise to the level of interference,

11.

nor does it provide justification for a parent's failure to have more than de minimis contact with a child." The trial court further noted that father has known how to contact mother, and knew where she lived. The court found it important that "[h]e regularly exercised supervised visitation with A.J. pursuant to a court order, but never filed any action for the allocation of parental rights and responsibilities for [M.M.]" The probate court also observed that "[e]ven when [father] and [M.M.] were at the same location during [father's] visitation exchanges with A.J., [father] never approached [M.M.] to talk to him." For these reasons, the probate court further found "clearly and convincingly that [father's] failure to provide more than de minimis contact with [M.M.] during the one-year period immediately preceding the filing of his Petition for Adoption was without justifiable cause."

{¶ 30} Father timely appealed the probate court's decision and asserts the following assignment of error:

> **SOLE ASSIGNED ERROR:** THE TRIAL COURT
> COMMITTED REVERSIBLE ERROR WHEN FINDING APPELLANT
> FAILED TO HAVE, WITHOUT JUSTIFIABLE CAUSE, MORE THAN
> DE MINIMIS CONTACT WITH HIS SON, M.M.

### II. Law and Analysis

{¶ 31} Because adoption terminates the fundamental rights of natural parents, written consent is generally required of parents before an adoption may proceed. R.C. 3107.06. Exceptions to this rule are set forth in R.C. 3107.07.

12.

{¶ 32} As the Supreme Court of Ohio has held, " '[a]ny exception to the requirement of parental consent [to adoption] must be strictly construed so as to protect the right of natural parents to raise and nurture their children.'" *In re Adoption of Masa*, 23 Ohio St.3d 163, 166, 492 N.E.2d 140 (1986), quoting *In re Schoeppner's*, 46 Ohio St.2d 21, 24, 345 N.E.2d 608 (1976). Relevant to this case, R.C. 3107.07(A) provides that consent is not required from:

[a] parent of a minor, when it is alleged in the adoption petition and the court, after proper service of notice and hearing, finds by clear and convincing evidence that the parent has failed without justifiable cause to provide more than de minimis contact with the minor or to provide for the maintenance and support of the minor as required by law or judicial decree for a period of at least one year immediately preceding either the filing of the adoption petition or the placement of the minor in the home of the petitioner.

{¶ 33} In other words, a parent's consent is not required when the parent has failed without justifiable cause to provide more than de minimis contact *or* maintenance and support during the relevant one-year period. *In re Adoption of A.K.,* 168 Ohio St.3d 225, 2022-Ohio-350, 198 N.E.3d 47, ¶ 17. (Because the statute is written in the "disjunctive," a parent's failure to meet either provision is sufficient to nullify the need to obtain that parent's consent.).

13.

{¶ 34} When construing R.C. 3107.07(A), courts are "obliged to strictly construe * * * [its] language to protect the interests of the non-consenting parent who may be subjected to the forfeiture or abandonment of his or her parental rights." *In re Adoption of Sunderhaus*, 63 Ohio St.3d 127, 132, 585 N.E.2d 418 (1992). That is because "[t]he rights to conceive and to raise one's children have been deemed essential, * * * basic civil rights of man, * * * and [r]ights far more precious * * * than property rights." (internal quotation marks and citations omitted.) *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972). The permanent termination of parental rights is "the family law equivalent of the death penalty in a criminal case." *In re Smith*, 77 Ohio App.3d 1, 16, 601 N.E.2d 45 (6th Dist.1991).

{¶ 35} The Supreme Court of Ohio has articulated a three-step test for appellate courts to use when reviewing a probate court's determination regarding the necessity of parental consent under R.C. 3107.07(A). *In re Adoption of A.K.* at ¶ 15, citing *In re Adoption of B.I.,* 157 Ohio St.3d 29, 2019-Ohio-2450, 131 N.E.3d 28, ¶ 15.

{¶ 36} First, the appellate court should consider "what the law or judicial decree require of the parent for the year prior to the filing of the petition." *Id.* ¶ 16. If the parent was acting pursuant to a court order in failing to provide maintenance and support *or* in failing to provide more than de minimis contact, then "the analysis ends there." *Id.* at ¶ 14, citing *In re Adoption of B.I.* at ¶ 16.

{¶ 37} Second, if there is neither a no-contact or no-support order at issue in the case, the probate court determines whether the petitioner has proven, by clear and

convincing evidence, that the natural parent failed to have more than de minimis contact with the child or failed to provide for the maintenance and support of the child during the relevant one-year period. *In re Adoption of M.B.*, 131 Ohio St.3d 186, 2012-Ohio-236, 963 N.E.2d 142, ¶ 23. Clear and convincing evidence is more than a preponderance of the evidence but does not rise to the level of beyond a reasonable doubt as required in criminal cases. It must produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), syllabus paragraph three. "A trial court has discretion to make these determinations and in connection with the [second] step of the analysis, an appellate court applies an abuse-of-discretion standard when reviewing a probate court decision." *In re Adoption of M.B.* at ¶ 25. To find an abuse of that discretion, we must determine that the probate court's decision was unreasonable, arbitrary, or unconscionable and not merely an error of law or judgment. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 450 N.E.2d 1140 (1983).

{¶ 38} Third, if the parent did not have more than de minimis contact or failed to comply with his or her obligation under the law or judicial decree to provide maintenance and support, the petitioner must establish, by clear and convincing evidence, that there was justifiable cause for that failure. *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 481 N.E.2d 613, paragraph four of the syllabus. A probate court's determination as to "justifiable cause" under R.C. 3107.07(A) will not be disturbed on appeal unless such determination is against the manifest weight of the evidence. *In re Adoption of Masa*, 23

15.

Ohio St.3d 163, 492 N.E.2d 140, at paragraph two of the syllabus; *Bovett*, paragraph four of the syllabus; *In re M.B.* at ¶ 24. The probate court, as the trier of fact, determines the weight and credibility of the evidence. *Seasons Coal Company, Inc. v. City of Cleveland*, 10 Ohio St.3d 77, 461 N.E.2d 1273 (1984). And, we may not substitute our judgment for that of the trier of fact. *Pons v. Ohio State Medical Board*, 66 Ohio St.3d 619, 614 N.E.2d 748 (1993). Instead, our role is to examine the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. *In re Adoption of T.U.,* 6th Dist. Williams No. WM-19-012, 2020-Ohio-841, ¶ 19, citing *State v. Thompkins,* 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

{¶ 39} In this case, the sole issue is whether the probate court properly concluded that father failed, without justifiable cause, to have more than de minimis contact with M.M. during the year preceding the adoption petition. There is no dispute that father paid child support during the relevant period and therefore did not fail to maintain and support M.M. as required by law or judicial decree.

{¶ 40} In addition, there is no argument or evidence that father was somehow prevented from having contact with M.M. via court order. Thus, we may proceed to the second and third steps of the analysis. That is, we must determine (1) whether the probate court abused its discretion in determining that father failed to have more than de minimis contact with M.M. during the year preceding the adoption petition and, if not, (2)

16.

whether the probate court's determination, that father lacked justifiable cause for his failure to have more than de minimis contact with M.M., is against the manifest weight of the evidence.

### A. The probate court's determination regarding de minimis contact is not an abuse of discretion.

{¶ 41} Father concedes that he "ha[s] not had successful visitation with M.M. since roughly June 2020,"[3] but he argues that he *attempted* to contact M.M. on multiple occasions during the relevant one-year period.  He emphasizes that courts—including this court—interpret "more than de minimis contact" under R.C. 3107.01(A) to include repeated instances of *attempted* contact by the non-consenting parent.  *See, e.g.*, *In re Z.H.*, 6th Dist. Williams No. WM-22-002, 2022-Ohio-3926, ¶ 45; *In re Adoption of T.U.* at ¶ 25. He argues that "the record is littered with evidence to demonstrate his [sic] and his wife, C.J.'s **attempted** visitation and companionship with M.M." and that the evidence demonstrates that he was "constantly attempting to arrange significant and meaningful contact with M.M., only to be met with excuses as to why M.M. is not required to give his biological father time."  (Emphasis in the original.)

---

[3] Father and S.S. both testified that father's last in-person visit with M.M. was on Father's Day in 2020.  The trial court, however, concluded that father had no in-person contact with M.M. "since 2018 during a visit with [A.J.] at [mother's] home."  This discrepancy is immaterial to the issue of de minimis contact during the relevant time period.  That is, whether the last visit was in 2018 or 2020, there is no dispute that father had *no* in-person visits with M.M. during the year preceding the filing of the adoption petition (April 13, 2021-April 13, 2022).

17.

{¶ 42} Father is correct that this court has held that "[w]hile not statutorily defined, 'more than de minimis contact' implies contact—either attempted or successful—beyond a single occurrence." *In re T.U.* at ¶ 25, citing *In re J.D.T.*, 7th Dist. Harrison No. 11HA10, 2012-Ohio-4537, ¶ 9. In other words, "the statute demands 'more quality and quantity' and requires 'more effort from the parent to have contact and communication with the child' than is shown by one-time contact. *Id.,* quoting *In re Adoption of K.A.H.*, 10th Dist. Franklin No. 14AP-831, 2015-Ohio-1971, ¶ 10.

{¶ 43} Father is also correct that repeated attempts to contact a child *can* be viewed by a probate court, in its sound discretion, as "more than de minimis contact" under R.C. 3107.01(A). For example, in *In re the Adoption of B.G.H.*, 5th Dist. Tuscarawas No. 2022 AP 01 0003, 2022-Ohio-1911, ¶ 38-39, the appellate court affirmed the probate court's determination that father "made more than de minimis effort to contact [B.H.]" by attempting to call B.H., texting with B.H. "on more than thirty days within the applicable one-year period," and by sending several unanswered text messages to B.H.'s mother that "specifically ask[] to see or meet B.H." *See also In re Z.H.* at ¶ 46 (affirming probate court's determination that Z.H.'s mother had more than de minimis contact during the relevant one-year period, even though she did not have any in-person visits with Z.H., because she texted grandfather six times, asking "to take," "to have," and "to see" Z.H., and texted grandfather two other times with messages for Z.H.); *In re Adoption of B.T.R.*, 5th Dist. Morrow No. 2019 CA 0005, 2020-Ohio-2685, ¶ 30-31 (affirming probate court's determination that child's father had more than de minimis

18.

contact where he tried to contact the child through written correspondence, which he still had but was unable to send because he did not have mother's address, and father filed for visitation with the common pleas court).

{¶ 44} However, that does not mean that multiple—but minimal—attempts to contact a child must be considered "more than de minimis contact" simply because they spanned beyond a "single occurrence." And here, father's efforts during the relevant time period—April 13, 2021-April 13, 2022—were certainly minimal and, depending upon the credibility of the witnesses, may have been singular.

{¶ 45} It is undisputed that father sent a text to mother on May 27, 2021, asking to talk to M.M. for his birthday. It is also undisputed that father approached stepfather when he happened to see him out in public on two occasions—once at the derby in October 2021, and once at WalMart in January or February 2022—and discussed M.M. Father testified that he asked to see M.M. on both occasions, but that he left it to stepfather to follow up and coordinate the visit for him. On the other hand, stepfather testified that father did not ask to see M.M. during these conversations. Instead, father merely asked where M.M. was at the time, and made general statements that he wanted to "step up" and "be a dad," but never followed through. Father testified that he ran into stepfather in "public" on a third occasion, in November or December 2021, and told him that he wanted to see M.M. and asked stepfather what M.M. wanted for Christmas.

{¶ 46} Father also testified that he saw M.M. in the backseat of the car during a custody exchange for A.J. in March 2022, but he did not speak with him. Father also said

19.

that he told stepfather during "a few" custody exchanges for A.J. that he wanted to see M.M.—but he did not give any definitive time period for these conversations, other than saying the last one was "before [he] had found out about the adoption papers." Stepfather, on the other hand, testified "with certainty" that this conversation with father occurred in May or June 2022, after the adoption petition was filed, and he remembers the time period because mother stayed in the car during the custody exchange because she was pregnant.

{¶ 47} Finally, although father testified that he has repeatedly called and texted mother about M.M. (including when he disguised himself by calling from C.J.'s phone), he did not provide a specific timeframe for those efforts, nor did he produce any texts or call logs to refute the evidence that mother presented—i.e., a screenshot of all texts between she and father between August 21, 2020 and April 11, 2022, the bulk of which concern A.J. Mother clearly testified that—other than the May 27 text— father did not call, text, or message her regarding M.M. at any other time during that one-year period.

{¶ 48} If the testimony of mother and stepfather is found to be credible, father attempted to contact M.M. on only one occasion during the year preceding the adoption petition—i.e., on May 27, 2021, when he asked mother via text to speak with M.M. on his birthday.

{¶ 49} Essentially, by arguing that his efforts to contact M.M. were more than de minimis, father is claiming that the trial court misjudged the credibility of the witnesses and should have believed him instead of mother and stepfather. But, even if father's

20.

testimony is believed, he did not testify *when* he tried calling and texting mother to see M.M.—i.e., there is no evidence to suggest these efforts occurred in the year preceding the adoption papers. Moreover, a few requests to stepfather during random public meetings, plus his seeing M.M. sitting in the backseat of a car at the sheriff's station (but not talking to him), is insufficient to demonstrate that the trial court's determination regarding father's "de minimis contact" was somehow unreasonable, arbitrary, or unconscionable. Simply put, we "will not impinge upon the trial court's discretion to determine the credibility of the witnesses, or to determine facts in dispute." *Snodgrass v. Snodgrass*, 5th Dist. Stark No. 7329, 1988 WL29638 (Feb. 29, 1988), *1.

{¶ 50} On this record, we cannot say that the trial court abused its discretion by concluding that petitioner satisfied his burden to demonstrate that father did not have more than de minimis contact with M.M. during the year preceding the adoption petition.

**B. The probate court's determination regarding justifiable cause is not against the manifest weight of the evidence.**

{¶ 51} Regarding justifiable cause, father argues that mother and stepfather "thwarted attempts by appellant and C.J. to reinsert appellant into M.M.'s life," and that their actions, combined with father's "lack of confidence, lack of aggressive nature, and, as he impliedly characterized it, lack of typical thought process," provides justifiable cause for his failure to provide de minimis contact with M.M.

{¶ 52} The probate court, however, saw things differently. It concluded that father was not precluded from contacting mother and stepfather regarding M.M.—the court noted that father had their contact information, knew where they lived, and regularly

21.

communicated with them regarding visitations with A.J.  The court noted that neither mother nor stepfather ever "blocked" father or otherwise prevented him from being able to contact them by phone or social media.  The court also found it relevant that mother and stepfather never "directly refuse[d]" father's requests to see M.M. over the years, and noted that "[a] tepid response to an occasional request to see a child does not rise to the level of interference."  Based on these factual determinations, the trial court concluded that stepfather established by clear and convincing evidence that there was no justifiable cause for father's failure to provide more than de minimis contact with M.M.

{¶ 53} "Justifiable cause"—as used within R.C. 3107.01(A)—does not have "a precise and inflexible meaning."  *Holcomb*, 18 Ohio St.3d 361, 481 N.E.2d 613, at paragraph four of the syllabus.  Rather, it is up to "the probate court as finder of fact" to answer the question of whether or not justifiable cause exists, and probate courts are "in the best position to observe the demeanor of parties, to assess their credibility, and to determine the accuracy of their testimony."  *Id.*   The Ohio Supreme Court has provided only one piece of specific "guidance" to courts regarding the existence of "justifiable cause" under R.C. 3107.01(A)— "*significant* interference by a custodial parent with communication between the non-custodial parent and the child, or *significant* discouragement of such communication, is required to establish justifiable cause for the non-custodial parent's failure to communicate with the child."  (Emphasis added.)  *Id.* at 367-368.

22.

{¶ 54} For example, in *Holcomb*, the Ohio Supreme Court considered the probate court's determination of justifiable cause in two consolidated cases—*In re Holcomb* and *In re Bradford*. In *Holcomb*, the court affirmed the probate court's finding of justifiable cause, concluding that petitioners "significantly interfered with and discouraged respondent's numerous and varied attempts to establish communication with her children." *Id.* at 369. Specifically, petitioners deliberately moved with the children to distance themselves from respondent, obtained an unlisted number, and refused to provide any contact information to respondent. The court found that the record demonstrated "a significant, deliberate, and concerted effort by petitioner and Holcomb to interfere with respondent's communication with her children." *Id.*

{¶ 55} In contrast, in the other consolidated case before the court, *In re Bradford*, the court affirmed the probate court's finding of *no* justifiable cause. The court noted that although the petitioner and mother "were not desirous of having respondent communicate or visit with the children, they did not significantly interfere with or discourage respondent from establishing contact." *Id.* at 622. The court found it relevant that respondent knew the children's address and phone number, but made "only one, unscheduled fortuitous attempt to contact them." *Id.* Both mother and petitioner testified that "they had not and would not have denied respondent his visitation privileges had he desired to exercise them." *Id.* And, although father testified that mother threatened to use her position as a highway patrol officer to have him arrested if he attempted to visit the children, the mother's testimony—"if given credence as it apparently was"—

23.

established that no such threats were made. *Id.* Finally, respondent could identify only one instance in which he was denied communication with his children. *Id.*

{¶ 56} In this case, father and C.J. testified that mother and stepfather repeatedly refused multiple requests to see M.M. throughout the years. Both witnesses claimed that mother did not respond to their texts, phone calls, and occasional in-person requests regarding M.M., which they claim were made at the custody exchanges for A.J. Father testified that he had even attempted to disguise himself by calling mother from C.J.'s phone, to no avail. But, neither father nor C.J. provided any clear timeframe for this alleged interference, nor did they provide any specific examples of this alleged behavior, other than A.J.'s birthday party "between 2020 and 2021," when they asked mother to leave M.M at the party with A.J. Mother said that M.M. was going fishing that day but they could take him "at a different time shopping, but with them" and father didn't want to do that.

{¶ 57} Father also claimed that mother told him during "a few" of A.J.'s custody exchanges that M.M., who was sitting in the backseat of the car, did not want to speak with him. Father also claimed that he asked stepfather to see M.M. "a handful of times" during A.J.'s custody exchanges—and on two occasions out in public—but he left it to stepfather to get back with him, and stepfather never followed up on those conversations. Father also testified that he didn't try to go to mother's house—despite knowing her address—because he was afraid that she would call the police, and he didn't want to have a confrontation in front of M.M. and A.J. When asked why he never filed in court for

24.

visitation rights with M.M., father said he doesn't "think like normal people" since receiving a concussion in 2012, and he thought he had to file in Wood County and he doesn't have the money to travel to Wood County. Father admitted that he is employed and does not have any medical condition or disability.

{¶ 58} The testimony of mother and stepfather, however, told a very different story.

{¶ 59} Mother testified that father only contacts her regarding M.M. on his birthday, May 27, as demonstrated by the screen shot of text messages that she offered into evidence. Mother says that father knows where she lives, knows her phone number (as evidenced by their texts regarding A.J.), and knows how to contact her on social media. She testified that father used to pick up M.M. along with A.J. for visits, but at a certain point father stopped asking for M.M. to be included in those visits. Mother testified that she has been giving M.M. the "option" of speaking with or seeing his father since he was ten years old (he is currently eleven years old).

{¶ 60} Stepfather's testimony was consistent with mother's testimony. He testified that he is not aware of any requests by father to see M.M. during the relevant time period. Stepfather said that father never asked him to see M.M. during any of their various conversations at the sheriff's station or out in public—rather, father usually made general statements about wanting to "step up" and "be a dad" for M.M., but never followed up with him or mother with a request to see M.M. Stepfather testified that he

25.

"may have" mentioned these conversations with father to M.M. and if he did, he and mother would have let M.M. decide if he wanted to see his father.

{¶ 61} On this record, we are hard pressed to conclude that the probate court's determination that petitioner met his burden of demonstrating that father lacked justifiable cause for his failure to provide more than de minimis contacts is against the manifest weight. This case came down to a battle of credibility between the witnesses, and we are mindful of our standard of review—manifest weight of the evidence.

> Under this highly deferential standard of review, a reviewing court does not decide whether it would have come to the same conclusion as the trial court. Rather, we are required to uphold the judgment so long as the record, as a whole, contains some evidence from which the trier of fact could have reached its ultimate factual conclusions. We are guided by the presumption that the trial court's factual findings are correct because the trial judge "is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.

*Bugg v. Fancher*, 4th Dist. Highland No. 06CA12, 2007-Ohio-2019, ¶ 9, quoting *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 79, 461 N.E.2d 1273 (1984). Accordingly, "when there are two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, we will not choose which one is more credible." *In re Adoption of T.C.W.*, 4th Dist. Meigs No. 19CA6, 2020-Ohio-1484, ¶ 46.

26.

{¶ 62} This case is unlike *In re Matter of the Adoption of B.B.S.*, 4th Dist. No. 15CA35, 2016-Ohio-3515, where the appellate court reversed the probate court's determination that the natural mother had no justifiable cause for failing to have more than de minimis contact as against the manifest weight of the evidence. In that case, B.B.S.'s mother texted appellees fifteen times during the relevant period. Appellee conceded that mother was "attempting to contact the child" through her text messages, and appellee "conceded during the hearing that she did not give those messages to the child." *Id* at ¶ 33-34. And, a few months before the adoption petition, appellees told the natural mother that they would not accept any further texts or calls from her. *Id.* at ¶ 36. The appellate court concluded that this evidence demonstrates "significant discouragement of communication between Appellant and the child," before reversing on manifest weight.

{¶ 63} In contrast to *B.B.S.,* mother and stepfather steadfastly denied father's allegations that they discouraged or prevented any communication or contact between father and M.M. The trial court apparently found their testimony to be reliable—or at least more reliable than father's testimony—and there is not overwhelming evidence sufficient for us to overturn the probate court's credibility determinations on appeal. *Compare In the Matter of the Adoption of R.L.L.*, 11th Dist. Trumbell No. 2021-T-0047, 2022-Ohio-1100, ¶ 13 (affirming probate court's finding that father had justifiable cause for failing to contact child where the probate court found that father had "*reliably* testified that he attempted to have communication with the minor" but was thwarted by

27.

the petitioners, threatened with police if he came to the minor's home, and blocked on social media) (emphasis added).

{¶ 64} Finally, we note that father's testimony—that he doesn't "think like normal people" since receiving a concussion in 2012—is not sufficient to tip the weight of evidence overwhelmingly in his favor. Despite whatever lingering problems father continues to suffer due to his concussion, the record shows that he is an employed and fully-functional member of society. *See In re Matter of the Adoption of K.D.*, 6th Dist. Lucas No. L-09-1302, 2010-Ohio-1592, ¶ 23 (finding that appellant's "limited cognition and bi-polar disorder" did not operate to provide justifiable cause for appellant's lack of contact where the evidence also showed that he was on medicine and "functional" for most of the relevant period, had completed the tenth grade, was not illiterate, and did not have any other cognitive impairment.).

{¶ 65} For all these reasons, we conclude that the probate court's determination, that father lacked justifiable cause for failing to provide more than de minimis contact with M.M., is not against the manifest weight of the evidence.

### III. Conclusion

{¶ 66} In sum, we find the probate court did not abuse its discretion when it concluded that petitioner had met his burden of establishing that father failed to provide more than de minimis contact with M.M. during the year preceding the filing of the adoption petition. We also find that the probate court's finding that father lacked

28.

justifiable cause for failing to have more than de minimis contact with M.M. is not against the manifest weight of the evidence.

{¶ 67} We find father's sole assignment of error not well-taken, and we affirm the judgment of the probate court. Pursuant to App.R. 24, father is ordered to pay the costs of this appeal.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J.

Gene A. Zmuda, J.

Myron C. Duhart, P.J.
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.

29.