[Cite as *In re C.N.*, 2023-Ohio-659.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re C.N., L.N.

Court of Appeals No. L-22-1194

Trial Court No. JC 20281693
JC 21284643

**<u>DECISION AND JUDGMENT</u>**

Decided: March 1, 2023

* * * * *

Rena (Laura) Laws, for appellee.

Ann Baronas, for appellant.

* * * * *

**OSOWIK, J.**

## I.    Introduction

{¶ 1} Appellant, Cl.N. ("father"), appeals the July 13, 2022 judgment of the Lucas

County Court of Common Pleas, Juvenile Division terminating his parental rights and

granting permanent custody of his children, C.N. and L.N., to Lucas County Children Services ("LCCS"), the appellee herein.[1]  For the following reasons, we affirm.

## II.      Background

### A. The Family's Involvement with LCCS

{¶ 2} LCCS first became involved with this family when C.W., the mother herein, tested positive for Tetrahydrocannabinol ("THC") at the time of C.N.'s birth, on June 18, 2019.  Mother has a long history of alcohol abuse and depression.  LCCS began working with mother "on a non-court basis."  On October 13, 2020, LCCS filed a complaint in dependency and neglect with respect to C.N., and following an emergency shelter care hearing, C.N. was placed into protective custody with a maternal aunt.  On December 7, 2020, C.W. was adjudicated a dependent child, and temporary custody was awarded to maternal aunt.  Temporary custody was changed to LCCS on April 7, 2021, as a result of maternal aunt "continuing to test positive for THC."

{¶ 3} L.N. was born on May 11, 2021.  L.N. tested positive for marijuana at the time of delivery.  Two days later, LCCS file a complaint in dependency and neglect, and interim custody was granted to the agency.  At a hearing on July 21, 2021, mother and father stipulated to a finding that L.N. was a dependent child, and temporary custody was awarded to LCCS.

---

[1] Mother's parental rights were also terminated under the trial court's July 13, 2022 judgment.  Because mother did not appeal, we confine our discussion to the issues raised by father in his appeal.

**B. A case plan is developed for father.**

{¶ 4} A case plan was developed with respect to father, which was filed and adopted by the juvenile court on December 7, 2020. Subsequent case plans were filed on February 17 and 25, 2021, June 3 and 24, 2021, August 31, 2021, and December 6, 2021. These case plans were also approved by the court.

{¶ 5} The extent to which father completed his case plan was a major issue at trial. Father's initial case plan required him to complete a dual assessment and follow recommendations and to complete domestic violence "batterer's" treatment. The parties agree that father completed an alcohol assessment at Unison, that he was assessed as having a mild alcohol disorder and that treatment was recommended, including periodic urine screens. The parties disagree as to whether father maintained his sobriety and the circumstances regarding his missed alcohol screens. The parties also disagree whether father completed his batterer's treatment.

{¶ 6} Father was granted supervised visitation with the children, once a week for one hour. Father attended "approximately half" of his visits. At trial, Father claimed that his work schedule prevented him from attending more regularly, while LCCS argued that father's work records did not support his claim.

{¶ 7} The "appropriateness" of father's housing was not assessed by LCCS. According to the agency, father failed to cooperate with the case manager to allow the

agency to "properly evaluate" his home. Father argued that the agency was aware of his address. He faulted the case manager for failing to schedule a home visit.

**C. LCCS moves for permanent custody, and a trial is held.**

{¶ 8} On October 5, 2021, LCCS filed a motion for permanent custody. As to father, the agency claimed that he "has refused to provide urine screens" and "only completed half his batterer's intervention assessment." It also alleged that the "appropriateness" of father's housing could not be verified due to his failure to "cooperate[]."

{¶ 9} A trial was held on May 25, 2022. In all, 5 witnesses testified: the ongoing case worker, Katie Roepke, a Toledo Police Officer, father, the Guardian ad litem ("GAL"), and a witness who appeared on mother's behalf. A summary of the relevant testimony follows:

### The LCCS Caseworker

{¶ 10} Katie Roepke was the ongoing caseworker for the duration of the case except for three months while she was on maternity leave.

{¶ 11} LCCS began working with father in June of 2020, when DNA results confirmed his paternity. Father's case plan required him to obtain a dual diagnostic assessment and batterer's intervention. Father was referred to Unison and completed an initial assessment there. Father was recommended for alcohol treatment ("AOD"), which he did "successfully complete." But, father was not compliant with requests to "drop

4.

urines." Father, who worked as a truck driver, told Roepke that he missed some screens because "he [was] working and on the road." Based on Roepke's review of his work logs, "sometimes" that was true and "sometimes" it was not. When father did provide urine samples, they were not always negative. They included, but were not limited to " a diluted screen [at the agency] just recently [before the trial] and then just a few weeks [before the trial] [he] had a positive ETG screen for alcohol."

{¶ 12} Father appeared at Unison for the purpose of a batterer's assessment, but he "left in the middle of [it] so it wasn't complete." According to Roepke, LCCS refers clients to providers, like Unison, who follow the "Deluth model" which is "intense" and involves working "in groups with other peers," over a 26-week period.

{¶ 13} Father returned to Unison, but when he "was recommended for treatment, [he] stated [that] he had other plans for [that] service." Later, father told Roepke that he completed a four-hour, on-line domestic violence course from an organization called "Court Ordered Classes." Roepke expressed "concern" that she did not have the "opportunity to speak to that provider," specifically about the particular issues needing to be "addressed." Roepke testified that she did not know father was taking the course "until he said he had a certificate for it."

{¶ 14} Under cross-examination, Roepke agreed that father provided her with a release allowing LCCS to access information from Court Ordered Classes and provided a certificate of completion. Roepke called the organization "to confirm the classes that

5.

[father] alleged he completed" and claimed that she "left several messages and sent an email with no response." Roepke agreed that, although that he was free to choose his own service provider, his failure to communicate prevented her from being able to "monitor [his] progress." And, Roepke maintained that the four-hour course did not meet the agency's requirements because it was a "domestic violence course" and not specific to "batters." Therefore, LCCS did not consider father to have "successfully" completed that part of his case plan.

{¶ 15} Regarding father's visits with the children, father told Roepke that he had the ability to "makes his [work] schedule" and that he preferred to visit with his children on Saturdays. Father made "about 50 percent" of his visits. Although father blamed his job, "[n]ot all of the visits were missed because [of work]," based on Roepke's review of his work logs.

{¶ 16} Father owns two residences, one on Moore Street and another on Sanders. Roepke said that it was "confusing" as to where father actually lived. Although he claimed to live on Moore Street, Roepke received "police reports and 911 calls from the Sanders address," where father was reported to be at the time.

{¶ 17} In summation, Roepke testified that, since working with father, "none" of the issues identified by the agency had resolved.

{¶ 18} Finally, Roepke testified that the foster parents, who have had C.N. for most of his life and L.N. since she was born, have expressed an interest in adopting them,

6.

should the children become available. She said that the children were doing "very well" in the foster parents' care.

**Toledo Police Officer J. Morrison**

{¶ 19} Next, LCCS called Toledo Police Officer John Morrison to testify. Officer Morrison responded to a 911 dispatch on July 8, 2021 to father's home on Moore Street. When the officer arrived, he found father "covered in blood and suffering from several lacerations." Father's wife and their children—older half siblings to C.N. and L.N.— were "several houses down the street away from the scene trying to protect themselves from [father]." The officer was told that father and his wife had gotten into "an altercation," that father had "grabbed a knife and was trying to attack [his wife]" and that alcohol was a factor. The couple's son intervened to protect his mother and "stabbed" father. Father was not charged with any offense. Although the son was charged, the record was unclear as to whether the state pursued those charges.

**Father**

{¶ 20} Besides C.N. and L.N., father has five other children, three of whom are adults. Father has worked as an "over-the-road" truck driver for "approximately two years." In July of 2021, father formed his own trucking company. He has no "typical work schedule," meaning he can work "seven days, sometimes two weeks, sometimes three days," depending on "obligations that [he has] here in Toledo." Father testified that continuing to work as a truck driver would "absolutely not" be feasible if custody of his

7.

children was restored to him. Father claimed to have "opened up a car dealership" in Toledo which "allows [him] to be home with [his] children on a daily basis * * * [to do] what a father needs to do." Father said that he "can't contest" the agency's claim that he failed to attend half of his visits.

{¶ 21} With regard to the on-line domestic violence course, father testified that he found it "because it was Covid and we could not have face-to-face meetings, so [he] had to do them by virtual. * * * [I]t wasn't a choice at that point." But, while still under direct examination, father was asked to confirm whether he told Unison that he just "preferred to do [treatment] somewhere else," and father answered, "I did [tell them]." Father claimed he told his caseworker of his intention to attend the on-line course "before" he started it.

{¶ 22} Father acknowledged past issues with alcohol and claimed that his treatment at Unison helped him to learn of "the importance of alcohol abuse and how it could potentially affect [his] family." Although he "stumbled a little" in the beginning of his treatment, father "made some changes" and "cleaned it up." Father realized that alcohol "cannot be a part of [his] life so he * * * [ceased] use of [it]." When asked whether he "stumbled" while in treatment at Unison, he replied that—early on—he tested positive for alcohol twice during routine screenings. Father insisted that was early in the case planning, "late 2020, early 2021," and since that time, he has not tested positive, "not since 2021."

8.

{¶ 23} As a result of the July of 2021 stabbing incident at his home, father was asked to complete another "dual diagnostic," for alcohol/substance abuse and domestic violence, this time as a victim (rather than perpetrator) of domestic violence. Father completed the assessment in September of 2021, and no further services were recommended.

{¶ 24} Father believes it is in C.N. and L.N.'s best interests to "be with their parent." He said he was ready, willing and able to care for them. In preparation, he "looked in to nanny services" and "live-in nannies" and has "relatives [who] are willing to step up to assist."

{¶ 25} When asked how many times the police have been called to his home on Moore Street for reports of domestic disputes over the past two years, father answered that he "couldn't recall." He gave that same response when asked if it was "more than five times"; "less than five times"; or "more than 20 times." He acknowledged that the police have also been called to his home at Sanders Drive when he has been present. Similarly, father could not recall how many times he had been "charged" with domestic violence, other than to say that "over the course of 30 years * * * it's been a few."

**The Guardian Ad Litem**

{¶ 26} With regard to father, the GAL testified that "he didn't want to participate in services [and] he didn't like talking to [her]." The GAL also "had a hard time getting ahold of [father]" because he rarely returned her calls. Overall, her assessment was that

9.

father "seemed to just want to do what he wanted to do when he wanted to do it." Consequently, the GAL had not observed "much progress with him * * * other than he hasn't been arrested."

{¶ 27} The GAL recommended that it was in the best interests of the children that LCCS be awarded permanent custody. She added that the children were "doing great in their current placement."

**C. The court grants LCCS's motion.**

{¶ 28} On July 13, 2022, the trial court granted LCCS's motion, terminating mother and father's parental rights and awarding permanent custody of C.N. and L.N. to LCCS. Father appealed and assigns the following error for our review:

> **Appellant's Assignment of Error Number One**: The trial court erred in finding that the children could not or should not be placed with their father pursuant to R.C. 2151.414(B)(1)(a) and (E)(1), (E)(2), (E)(4) and (E)(16) and was not supported by clear and convincing evidence.

**III. Law and Analysis**

{¶ 29} R.C. 2151.414 sets forth "specific findings a juvenile court must make before granting an agency's motion for permanent custody of a child." *In re A.M.,* 166 Ohio St.3d 127, 2020-Ohio-5102, 184 N.E.3d 1, ¶ 18, citing *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 22. As relevant here, the court must find by clear and convincing evidence "(1) that one or more of the conditions in R.C.

10.

2151.414(B)(1)(a) through (e) applies and (2) that a grant of permanent custody is in the child's best interest. R.C. 2151.414(B)(1)." *Id.*

{¶ 30} R.C. 2151.414(B)(1)(a) requires a finding that *the child* has not been abandoned or orphaned, has not been in the custody of a public children services agency or a private child placing agency for at least 12 months of a consecutive 22-month period, and *cannot be placed with either parent within a reasonable time or should not be placed with either parent*; subsection (b) requires a finding that the child is abandoned; subsection (c) requires a finding that the child is orphaned and there are no relatives who are able to take permanent custody; subsection (d) requires a finding that *the child has been in the temporary custody of a public children services agency or a private child placing agency for at least 12 months of a consecutive 22-month period*; and subsection (e) requires a finding that the child or another child the parent had custody of has been adjudicated abused, neglected, or dependent on three separate occasions. (Emphasis added.)

{¶ 31} In this case, the trial court found—as to the first element—that subsection (B)(1)(a) applied (as to C.N. and L.N.) and that subsection (B)(1)(d) applied (as to C.N. only). That is, the court determined that the children cannot and should not be placed with either of the parents within a reasonable time *and* that C.N. has been in the temporary custody of JFS for 12 or more months of a consecutive 22-month period. It

11.

found—as to the second element—that a grant of permanent custody to LCCS was in C.N.'s and L.N.'s best interest.

{¶ 32} On appeal, father does not contest the trial court's finding under Section (B)(1)(d), i.e. that C.N. was in temporary custody for the requisite time period. Similarly, father does not contest the trial court's best interest finding under R.C. 2151.414(D). But, Father does contest the juvenile court's determination that, under R.C. 2151.414(B)(1)(a), that the children should not, and could not within a reasonable time, be placed with him. We confine our decision to that issue. *Accord In re A.M.* at ¶ 18.

{¶ 33} We review a trial court's determination in a permanent custody case under a manifest-weight-of-the-evidence standard. *In re P.W.*, 6th Dist. Lucas No. L-12-1060, 2012-Ohio-3556, ¶ 20. In doing so, we must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the decision must be reversed. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). But, while we review the evidence and consider the witnesses' credibility, we must be mindful that the juvenile court, as the trier of fact, is in the best position to weigh evidence and evaluate testimony. *In re. P.W.* at ¶ 20. Its discretion in determining whether an order of permanent custody is in the best interest of a child "should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned."

12.

(Internal citations omitted.) *In re C.P.*, 10th Dist. Franklin No. 08AP-1128, 2009-Ohio-2760, ¶ 10.

{¶ 34} Because the juvenile court determined that R.C. 2151.414(B)(1)(a) applies to the facts of this case, the court was required to consider whether any of the factors enumerated in R.C. 2151.414(E) are present that would indicate that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. *In re B.K.*, 6th Dist. Lucas No. L-10-1053, 2010-Ohio-3329, ¶ 42-43. A court need only find one (E) factor present to support a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. *In re C.F.* at ¶ 50, citing *In re William S.*, 75 Ohio St.3d 95, 661 N.E.2d 738 (1996), syllabus.

{¶ 35} Here, the juvenile court found that four "E Factors" applied, specifically, Sections (E)(1), (E)(2), (E)(4) and (E)(16). Those sections provide,

> (E) In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the

13.

Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

(2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or

for the purposes of division (A)(4) of section 2151.353 of the Revised Code; * * *

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child; * * *

(16) Any other factor the court considers relevant.

{¶ 36} All of the court's findings under R.C. 2151.414 must be by clear and convincing evidence. "Clear and convincing evidence" is evidence sufficient for the trier of fact to form a firm conviction or belief that the essential statutory elements for a termination of parental rights have been established. *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus; *In re Tashayla S.*, 6th Dist. Lucas No. L-03-1253, 2004-Ohio-896, ¶ 14.

**The evidence supports the trial court's finding that the children could not be returned to father's care within a reasonable time or should be returned.**

{¶ 37} In this case, the trial court found, as to Section (E)(1), that father "ha[s] not successfully completed [his] case plan services to ensure a safe and loving environment for [his] children. * * * [Father] completed his substance abuse services but continues to have positive alcohol screens, when he does submit to testing. He even has a positive screen within a month of the permanent custody trial. [Father] failed to work with LCCS

15.

and abide by their recommendations for domestic violence services and has failed to complete the proper course he was advised to take."

**{¶ 38}** On appeal, father claims that he remedied the problems that caused the children's removal by substantially complying with and successfully completing his case plan services. Specifically, father asserts that he completed: (1) "multiple dual diagnostic assessments the last of which indicated he needed no further services;" (2) substance abuse treatment at UNISON [which did not refer him] for any additional treatment during the case;" and (3) "Domestic Violence treatment and Batterers treatment [which was] approved by the case worker, her supervisor and others at [LCCS]."

**{¶ 39}** Father's claims are not supported by the record. With regard to batterer's treatment, father reported to Unison on three separate occasions. During the first occasion, he refused to answer the questions and left. When he returned, father was recommended for treatment, which he declined, indicating that he preferred to compete the course elsewhere. At trial, LCCS argued that, while father may have completed an on-line "domestic violence" course, it was not specifically designed for "batterer's," i.e. perpetrators of domestic violence. Either way, the class was never "approved" by LCCS. We find clear and convincing evidence in the record supports the trial court's conclusion that father did not complete that part of his case plan. With regard to father's case planning for his alcohol use, it was undisputed that, after he completed his treatment, father continued to abuse alcohol, even after he professed to have "ceased" drinking.

16.

Father provided a "diluted screen" and failed another screen, in the days and weeks leading up to the trial. He was also not compliant with his caseworker's request to "drop urines," and his driver logs did not support his claim that he was "on the road" at the time of the missed screens.

{¶ 40} A parent "is afforded a reasonable, not an indefinite, period of time to remedy the conditions causing [a child's] removal." *In re A.L.A.*, 11th Dist. Lake Nos. 2011–L–020 and 2011–L–021, 2011–Ohio–3124, ¶ 108. (Finding that mother was not entitled to more than the 18 months that had elapsed since the case plan in that case was filed). And, we see no evidence that would allow us to conclude that additional time would make any difference in this case. In sum, the record contains clear and convincing evidence to support the trial court's finding under Section (E)(1) that, despite father's compliance with some aspects of his case plan, he failed continuously and substantially to remedy the conditions that caused the children's removal.

{¶ 41} As to Section (E)(2), the juvenile court found that father "suffer[s] from such severe chemical dependency that [he is] unable to provide an adequate permanent home for the [children] at the present time. * * * Additionally, this Court finds that it is highly unlikely that [father] will remedy [his] chemical dependency within one year from the trial date of this matter. * * * As set forth more fully above, [father has] participated in substance abuse treatments but still struggle[s] to maintain [his] sobriety. * * * [Father] continues to have positive screens after completing his substance abuse services."

17.

{¶ 42} Father does not dispute that, even after completing substance abuse treatment at UNISON, he continued to "test positive * * * on occasion." While not disputing his continued alcohol abuse, he hardly acknowledges it to be a problem. Instead, he clings to the fact that "no additional treatment * * * [or] service," were recommended, even after his "third dual diagnostic assessment." Father concludes that the absence of any recommendation signifies that the LCCS had no "additional concerns."

{¶ 43} In fact, LCCS did express "additional concerns," in light of father's missed, diluted, and positive screens, and the trial court agreed. On this record, we find that competent, credible evidence supports the trial court's finding under Section (E)(2).

{¶ 44} As to Section (E)(4), the court found that "father [has] demonstrated a lack of commitment toward [his] children by failing to visit them on a consistent and regular basis. * * * The father only appears to see his children half of the scheduled visits."

{¶ 45} Father does not "contest" the agency's evidence that he only attended half of his visits. Although he claims that he visited his children "as often as possible," his travel logs indicate that not all of his missed visits were work-related. Given the relatively little amount of parenting time granted to father, not to mention the very young ages of C.N. and L.N., father's failure to make more of an effort to make every visit, in our view, supports the juvenile court's conclusion that father demonstrated a lack of commitment to them.

18.

{¶ 46} Additionally, we note that Section (E)(4) provides that a "lack of commitment" is also demonstrated by an "unwillingness to provide an adequate permanent home for the child." Here, the appropriateness of father's home was never evaluated, and the evidence in the record indicates that father bears some, if not all, of the blame for that. For example, when the caseworker made an "unannounced" visit to father's Moore Street home, father "refused" to meet with her or to allow her inside but agreed she "could return" the next day. When the case manager did return, as scheduled, he "did not answer the door." We found other relevant evidence in the record, including a magistrate's finding, adopted by the juvenile court, that "911 records show that 35 calls [were placed from] father's address concerning violence from November 2019 through April 2020." Then, there is the incident in July of 2021. Although father may have been the *victim* of domestic violence, at the hands of his own son, the surrounding circumstances of that altercation, i.e. that the son was defending his mother from father's assault with a knife, and that the family fled down the street in fear of father, only serves to reinforce the juvenile court's conclusion that father failed to provide an adequate permanent home for his young children.

{¶ 47} Finally, as to Section (E)(16), the court found that "father refuses to complete classes he was advised to take by LCCS."

{¶ 48} Father insists that he never refused to complete services; he merely chose to work with a different provider.

19.

{¶ 49} Father's argument misses the point. LCCS did not insist that he obtain batterer's treatment from any particular provider or insist on a certain curriculum. Thus, whether LCCS *would have* approved coursework from father's preferred provider, i.e. Court Ordered Classes, cannot be known, for the simple reason that father failed to consult with the agency. Instead, he unilaterally chose to participate in a course and, only after the fact, did he tell his caseworker about it. His delay further hindered his standing because it precluded the agency from evaluating whether the program was appropriate for him or from verifying his compliance. Nonetheless, when the caseworker was provided with a release and contact information, she "left several messages and sent an email with no response." LCCS determined that the course was not suitable and that father failed to "successfully" complete that part of his case plan. For this, father has only himself to blame.

{¶ 50} Finally, we address father's claim that he lost custody of his children, not because he failed to comply with his case plan but because his caseworker "did not like [him]" and "claimed he was difficult to work with."

{¶ 51} Roepke did describe father as "difficult." By way of example, she said that she would ask him "questions to try to engage him [to] be able to assess [his] progress." And, he would reply, "we'll just talk about it at court, you'll find out about it at court." Roepke concluded that it was "very hard to assess and engage him and make a

20.

recommendation based on very little engagement from him." In its decision, the trial court concluded that father "does not cooperate with LCCS."

{¶ 52} Deferring to the trial court on matters of credibility is "crucial in a child custody case, where there may be much evident in the parties' demeanor and attitude that does *not* translate to the record well." (Emphasis in the original.) *Davis v. Flickinger*, 77 Ohio St.3d 415, 419, 674 N.E.2d 1159 (1997). On this record, we cannot say that the juvenile court's determination is against the manifest weight of the evidence. Indeed, this case came down to a battle of credibility between the witnesses, and we are mindful of our standard of review—manifest weight of the evidence.

> Under this highly deferential standard of review, a reviewing court does not decide whether it would have come to the same conclusion as the trial court. Rather, we are required to uphold the judgment so long as the record, as a whole, contains some evidence from which the trier of fact could have reached its ultimate factual conclusions. We are guided by the presumption that the trial court's factual findings are correct because the trial judge "is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony."

*In re Adoption of M.M.* 6th Dist. Huron No. H-22-016, 2023-Ohio-397, ¶ 61 (Applying manifest weight standard in adoption proceeding) quoting *Bugg v. Fancher*, 4th Dist.

Highland No. 06CA12, 2007-Ohio-2019, ¶ 9, quoting *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 79, 461 N.E.2d 1273 (1984).

{¶ 53} While the trial court was only required to make findings under one subsection of R.C. 2151.414(E) to support its decision, we find that competent, credible evidence supports the trial court's findings under R.C. 2151.414(E)(1), (2), (4) *and* (16) as to father. *Carlos R.*, 6th Dist. Lucas No. L-07-1194, 2007-Ohio-6358, ¶ 38. Therefore, we find that the trial court did not err in finding that the children could not be placed with father within a reasonable time or should not be placed with him. We further find that the juvenile court's award of permanent custody to LCCS in this case was not against the manifest weight of the evidence. Accordingly, father's assignment of error is not well-taken.

## IV.    Conclusion

{¶ 54} For the reasons expressed above, we find that the trial court's decision was supported by clear and convincing evidence and was not against the manifest weight of the evidence. We find that father's assignment of error is without merit. Therefore, the July 13, 2022 judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. Pursuant to App.R. 24, costs of this appeal are assessed to father.

Judgment affirmed.

22.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Thomas J. Osowik, J.

Christine E. Mayle, J.

Myron C. Duhart, P.J.
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.