**[Cite as *In re C.S.*, 2023-Ohio-1662.]**

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re C.S.

Court of Appeals No.  L-23-1015

Trial Court No.  JC 21284244

**DECISION AND JUDGMENT**

Decided:  May 15, 2023

* * * * *

Rena (Laura) Laws, for appellee.

Laurel A. Kendall, for appellant.

* * * * *

**ZMUDA, J.**

## I.      Introduction

**{¶ 1}** Appellant, S.K. ("mother"), appeals the judgment of the Lucas County Court

of Common Pleas, Juvenile Division, granting a motion for permanent custody filed by

appellee, Lucas County Children Services ("LCCS"), thereby terminating her parental rights with respect to her minor child, C.S.[1]  Finding no error below, we affirm.

## A.  Facts and Procedural Background

{¶ 2} On April 19, 2021, LCCS filed its complaint in this action, alleging that C.S. and her brother, J.E., were dependent and neglected based upon several referrals LCCS had received concerning the children.  In its complaint, LCCS alleged that it received the first referral on February 8, 2021, when it was informed that J.E. was sexually and physically abused in the past.  Thereafter, on March 17, 2021, LCCS received a second referral alleging that police had responded to an overdose call at mother's residence, where they discovered an unresponsive male, Ryan, on mother's couch.  Although mother was home at the time, the officers were allegedly greeted by a two-year-old child at the door.  Further, mother was uncooperative with officers' instructions.

{¶ 3} Approximately one week later, on March 25, 2021, LCCS received a third referral alleging that mother was unconscious in her bathroom.  Specifically, J.E. reported to his father, Jo.E., that he found mother unconscious in the bathtub.  C.S. was also in the bathtub at the time.  J.E. removed C.S. from the bathtub and contacted his great aunt, who then called 911.  By the time officers arrived at the residence, mother was awake.  The

---

[1] C.S.'s father, D.S., is deceased.

2.

officers discovered Ryan hiding in a closet with "substances" on his person, and both mother and Ryan were subsequently transported to the hospital.

{¶ 4} In its complaint, LCCS requested an emergency shelter care hearing and placement of J.E. and C.S. in the temporary custody of either a relative or the agency. Additionally, LCCS requested an adjudication hearing within 30 days, at which the trial court could determine whether J.E. and C.S. were dependent and neglected children. Finally, LCCS sought an order from the trial court awarding temporary custody of J.E. to Jo.E. and temporary custody of C.S. to a relative or the agency following a dispositional hearing.

{¶ 5} An emergency shelter care hearing was held before a magistrate on the day LCCS filed its complaint. Following the hearing, the magistrate found that there was probable cause to believe that shelter care was required to protect J.E. and C.S. from immediate or threatened physical or emotional harm. The magistrate further concluded that the children's continued residence in mother's home would be contrary to their best interests and welfare. Accordingly, the magistrate granted interim temporary custody of C.S. to LCCS. Interim temporary custody of J.E. was awarded to Jo.E.

{¶ 6} Following the emergency shelter care hearing, the juvenile court appointed Terri Town as the children's guardian ad litem, and the matter proceeded through discovery and motion practice.

3.

{¶ 7} An adjudication hearing was held on June 10, 2021. At the hearing, mother consented to a finding that J.E. and C.S. were dependent and neglected. Consequently, the magistrate determined that the children were dependent and neglected, retained the custody arrangement previously ordered following the shelter care hearing, and scheduled the matter for disposition. On July 16, 2021, the juvenile court approved and adopted the magistrate's adjudication decision.

{¶ 8} On November 12, 2021, a disposition hearing was held before the magistrate. By agreement of the parties, C.S. was placed into the temporary custody of LCCS, and Jo.E. was awarded legal custody of J.E. The juvenile court then relieved Jo.E. from any further proceedings, and continued the matter for an annual dispositional hearing as to C.S. The juvenile court approved and adopted the magistrate's disposition decision on December 2, 2021.

{¶ 9} Thereafter, on December 15, 2021, the trial court approved the case plan filed by LCCS as to mother. The goal of the case plan goal was mother's reunification with C.S., and it sought to address mother's mental health, substance abuse, and parenting issues.

{¶ 10} On August 23, 2022, LCCS filed a motion for permanent custody of C.S. In its memorandum in support of its motion, LCCS asserted that C.S. could not be placed with mother within a reasonable time or should not be placed with mother under R.C.

4.

2151.414(B)(1)(a), and that permanent custody with LCCS was in C.S.'s best interest under R.C. 2151.414(D). LCCS offered three arguments to support its assertion.

{¶ 11} First, under R.C. 2151.414(E)(1), LCCS argued that mother failed to substantially remedy the conditions that warranted C.S.'s removal from mother's home. Specifically, LCCS argued that regular drug screens established mother's continued substance abuse during the pendency of this case. Moreover, LCCS contended that mother's home was unsafe due to physical hazards in the home, such as broken glass, dangerous tools, and clutter throughout the home.

{¶ 12} Second, under R.C. 2151.414(E)(2), LCCS argued that mother suffers from severe chemical dependency such that she cannot provide an adequate permanent home for C.S. in the foreseeable future. To establish this argument, LCCS relied upon several failed drug screens in which mother tested positive for substances including fentanyl. Additionally, LCCS asserted that mother's chemical dependency manifested in mother's inability to consistently attend group and counseling services.

{¶ 13} Third, under R.C. 2151.414(E)(4), LCCS argued that mother demonstrated a lack of commitment to C.S. by failing to regularly support, visit, or communicate with C.S., or by showing an unwillingness to provide a permanent home for C.S. In support, LCCS referred to mother's failure to engage with parenting services and inconsistency in visiting C.S.

5.

{¶ 14} The matter proceeded to a hearing on LCCS's motion for permanent custody on December 7, 2022. LCCS called two witnesses to testify at the hearing. The LCCS caseworker assigned to this case, Hannah Jerik, was the first witness to testify for LCCS.

{¶ 15} At the outset, Jerik testified concerning the referrals LCCS received in connection with this case. In general, the details Jerik provided about the referrals were consistent with the aforementioned allegations contained in LCCS's complaint.

{¶ 16} Thereafter, Jerik testified concerning the case plan services mother was offered after C.S. was removed from her home. In particular, Jerik testified that the initial goal of mother's case plan was reunification. To achieve such reunification, mother was ordered to "complete a dual assessment as well as parenting."

{¶ 17} Jerik stated that mother was originally referred to BrightView to complete her dual assessment, but she was subsequently discharged and sent to Talbot. At Talbot, mother was recommended to do intensive outpatient treatment. Jerik acknowledged that mother completed intensive outpatient treatment, but mother was still engaging in services at Talbot as of the date of the hearing. Specifically, mother was still undergoing "nonintensive outpatient treatment," as well as individual counseling, case management, and random urine screens. As to mother's completion of these case plan services, Jerik stated that mother was compliant with attendance. Indeed, Jerik acknowledged that mother "is very consistent, compliant with Talbot."

6.

{¶ 18} However, Jerik stated that mother's substance abuse issues were unresolved. Specifically, Jerik stated that mother participated in two detoxification programs, one at the University of Toledo Medical Center and another at Midwest Recovery. Jerik was unable to state with certainty whether mother successfully completed either program, but Jerik noted that mother did not consistently provide random urine screens. Moreover, Jerik testified that mother "continuously tests positive for THC about every drug screen, and she also has tested positive for oxycodone earlier this year * * *." As an example, Jerik referenced urine screens collected from mother on October 14 and November 17, 2022, both of which tested positive for contained traces of amphetamines, methamphetamines, and THC. Jerik testified that urine screens collected by Talbot also tested positive for methamphetamines and THC.[2]

{¶ 19} Mother was originally referred to Providence Center to complete her parenting services. On April 14, 2022, mother brought a firearm to her parenting class at Providence. Likewise, mother came to class the following week carrying a firearm. When asked to explain why she brought a firearm to parenting classes, mother explained that she felt unsafe because there was a domestic violence batterer's group that met at Providence immediately after her parenting class. Consequently, mother asked to be

---

[2] On cross examination, Jerik was asked about a medical marijuana card belonging to mother, which was provided to LCCS in discovery. Jerik acknowledged the existence of the card, but on redirect examination it was revealed that the card was not issued until November 2022, several months after the positive urine screens.

7.

referred elsewhere, and was then placed with the Family and Child Abuse Prevention Center for parenting services.

{¶ 20} When asked on direct examination whether she believed mother completed the services in her case plan, Jerik responded in the negative. She explained that "mother is still linked with aftercare with Talbot with no successful termination given, as well as the positive drug screens that we continue to receive, and mother is to complete parenting observations with the parenting classes we request and those are not successfully completed at this time." Jerik elaborated that mother's parenting observations were incomplete "due to * * * mother's availability, foster parent's availability, and the provider's availability being limited."

{¶ 21} On cross examination, Jerik agreed that mother has completed parenting classes to the best of her ability. According to her records, mother was expected to complete three parenting observations, but had only completed one at the time of the hearing. A second observation was scheduled, but had to be canceled "due to the foster parents' schedule." Ultimately, Jerik indicated that mother was "compliant with all the recommendations on the case plan."

{¶ 22} Based upon mother's unresolved substance abuse issues, failure to complete parenting observations (albeit due to scheduling issues not within her exclusive control), and inconsistent visitation attendance, Jerik opined that an award of permanent custody of C.S. to LCCS was in C.S.'s best interests. Jerik agreed that LCCS expected

8.

mother to obtain and maintain sobriety in order to successfully complete her case plan. She went on to testify that mother has failed to achieve such sobriety, and noted that mother's substance abuse issues were LCCS's main concern. Moreover, Jerik distinguished between complying with case plan services and implementing those services. Jerik testified that LCCS "would like to see a behavior change," which had not yet materialized with mother despite her technical compliance with the majority of her case plan services.

{¶ 23} At the conclusion of Jerik's testimony, LCCS indicated that its only remaining witness was Town. LCCS sought permission from the juvenile court to call Town at the conclusion of mother's case-in-chief. Without objection from mother, LCCS's request was granted. Thereafter, the matter proceeded to mother's case-in-chief.

{¶ 24} Mother's first witness was Karen Henderson. As a case manager at Talbot, Henderson began interacting with mother in March 2022. According to Henderson, she meets with mother three to four times per week. Henderson testified that she links mother with community resources and ensures that mother keeps her appointments with mental health providers and doctors.

{¶ 25} Henderson also monitors mother's urine screen results. According to Henderson, she has not observed mother using any illegal substances, although Henderson acknowledged that she assisted mother in connecting with a medical marijuana provider. At one point, she learned that mother tested positive for

9.

methamphetamines. After learning of the urine screen results, Henderson contacted mother's mental health provider and learned that "the generic form of whatever medication she prescribed was sending off a * * * false positive for that particular drug." Henderson later explained that mother's ADHD medication was the cause of the false positive.

{¶ 26} On cross examination, Henderson was asked whether she was aware of any drugs that would cause a false positive for methamphetamine. She responded: "In my experience the – it's one drug that I come across quite often that comes up as methamphetamines and it is treated – it is a treatment for ADHD, and it starts with a D and because I'm not a medical person I cannot say it to you." Further, she stated that mother's mental health provider confirmed that the methamphetamine result was a false positive via email. No such email evidencing the false positive was introduced into the record.

{¶ 27} Since March 2022 when she began working with mother, Henderson had an opportunity to visit mother's residence approximately four times per month. She described the three-bedroom residence as "pretty stable for now. It's a home. It's clean. I'm comfortable when I walk in there." Henderson stated that she has no safety concerns with respect to mother's residence. Moreover, Henderson testified that mother is compliant with her services with Talbot.

10.

{¶ 28} Following Henderson's testimony, mother took the stand. Concerning her case plan, mother testified that she completed all services included in the plan. Mother admitted that she experienced a substance abuse relapse in 2020 following the loss of D.S., to whom she was engaged at the time. According to mother, she started abusing pain medication and ultimately turned to fentanyl. Although she admitted to abusing substances around the time of the incident that occurred in which she was found unconscious with C.S. in the bathtub, mother testified on cross examination that the incident was not the product of an overdose. Instead, mother insisted that she had a seizure disorder and had experienced a seizure that rendered her unconscious.

{¶ 29} Eventually, mother sought mental health and substance abuse treatment through Harbor, Midwest Recovery, and BrightView. Additionally, mother stated that she completed a detoxification program at the University of Toledo Medical Center in July 2021. Thereafter, she was transferred to Talbot.

{¶ 30} Mother testified that she has "completed just about every step that you can through * * * the drug rehab program. I am at a point in time now to where I just see my providers * * * once a month just for medication refills. I've completed their classes. Any and everything that was asked of me I've completed successfully." Mother responded in the negative when asked if she was presently using methamphetamine. Indeed, mother testified that she has "never personally ever used methamphetamine."

11.

She explained that her positive test result for methamphetamine was due to her Adderall prescription that she uses to regulate her ADHD.

{¶ 31} As to her use of marijuana, mother stated that she has a medical marijuana card, which she obtained from a prescribing doctor in November 2022. She explained that she uses medical marijuana for weight gain and stress relief.

{¶ 32} Mother testified that her relationship with C.S. is one of the most important relationships in her life. She indicated that she does not get to visit C.S. as often as she would like, because Jerik "is not able to get the foster parents to attend the visits let alone the observations." Mother insisted that she had completed all of the parenting services that were in her power to complete, and stated that there was nothing more she could do if the foster parents would not cooperate. According to mother, her opportunity to visit C.S. went "completely downhill" from the prior court appearance. Rather than receive more frequent visits, mother stated that she was "lucky if I get that one Thursday a week." Mother complained about her missed visits with C.S., but no improvement in the situation was forthcoming.

{¶ 33} At the conclusion of mother's testimony, LCCS called Town as its final witness. As C.S.'s guardian ad litem, Town had the opportunity to conduct an independent investigation into the issues that prompted LCCS to get involved with mother. In doing so, Town interviewed mother, J.E., and C.S. She also reviewed LCCS's case file and all relevant hospital and mental health records. Town testified that

12.

C.S. was doing well in her current placement. She stated that C.S. appears to be bonded with her caregivers, who are willing to adopt her.

{¶ 34} Based upon observations she made during mother's visitations, Town stated that mother's interactions with C.S. were appropriate. Further, Town expressed no concerns with mother's ability to parent C.S. Nonetheless, Town recommended an award of permanent custody to LCCS. This recommendation was based upon Town's concern about mother's ongoing substance abuse issues. Town testified that mother sometimes ignored her requests to submit urine screens, and she stated that mother's most recent urine screen was submitted several months prior to the hearing. In short, Town characterized mother's substance abuse issues as "unresolved" and stated that there are "a lot of unanswered questions" regarding mother's substance abuse problems.

{¶ 35} Following Town's testimony, the parties presented brief closing arguments to the juvenile court. During its closing argument, LCCS focused upon mother's history of substance abuse, and maintained that such substance abuse was ongoing and unresolved by mother. LCCS acknowledged the testimony provided by several witnesses as to mother's technical compliance with her case plan services, but argued that such compliance did not lead to the desired change in behavior, especially regarding substance abuse.

{¶ 36} In response, mother's counsel argued that the record demonstrated that mother fully addressed her substance abuse addiction issues. Further, mother's counsel

13.

contended that the testimony provided during the hearing showed that mother was a "phenomenal parent" to C.S. She maintained that mother was capable of providing C.S. with a loving, stable, and safe home. Thus, mother's counsel urged the juvenile court to deny LCCS's motion for permanent custody.

{¶ 37} Upon consideration of the testimony, exhibits, and the parties' arguments, the juvenile court found that mother had not resolved the substance abuse issues that prompted this case. Citing the test results from mother's urine screens, the court reasoned that mother continued to abuse substances even after completing some of her case plan services. The court noted that mother consistently tested positive for THC, and it discounted mother's reliance upon her medical marijuana card as a justification because the card was only recently acquired and the positive tests predated the card by many months. Further, the court expressed its concern regarding mother's positive tests for methamphetamines. The court rejected mother's explanation that she tested positive for methamphetamine due to her prescription medications, because the court was unable to locate anywhere in mother's medical records where such a claim could be supported. Further, the court discounted Henderson's testimony that mother's prescriptions caused a false positive as to methamphetamine, noting that no evidence or medical testimony was introduced to support that claim.

{¶ 38} Based upon its conclusion that mother's substance abuse issues were ongoing, the juvenile court determined that a grant of permanent custody to LCCS was in

14.

C.S.'s best interest. Consequently, it granted LCCS's motion for permanent custody, thereby terminating mother's parental rights with respect to C.S. Thereafter, mother filed her timely notice of appeal.

### B. Assignments of Error

{¶ 39} On appeal, mother assigns the following errors for our review:

I. The trial court's finding that the child cannot be placed with [her] mother within a reasonable time or should not be placed with [her] mother pursuant to R.C. 2151.414(E)(1) was not supported by clear and convincing evidence.

II. The trial court's finding that the child cannot be placed with [her] mother within a reasonable time or should not be placed with [her] mother pursuant to R.C. 2151.414(E)(4) was not supported by clear and convincing evidence.

### II. Analysis

{¶ 40} In mother's assignments of error, she argues that the trial court's finding that C.S. cannot be placed her within a reasonable time or should not be placed with her pursuant to R.C. 2151.414(E)(4) was not supported by clear and convincing evidence.

{¶ 41} "A trial court's determination in a permanent custody case will not be reversed on appeal unless it is against the manifest weight of the evidence." *In re A.H.*, 6th Dist. Lucas No. L-11-1057, 2011-Ohio-4857, ¶ 11, citing *In re Andy-Jones*, 10th

15.

Dist. Franklin Nos. 03AP-1167, 03AP-1231, 2004-Ohio-3312, ¶ 28. In conducting a review on manifest weight, the reviewing court "weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997); *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 17.

{¶ 42} We recognize that, as the trier of fact, the trial court is in the best position to weigh the evidence and evaluate the testimony. *In re Brown*, 98 Ohio App.3d 337, 342, 648 N.E.2d 576 (3d Dist.1994). Thus, "[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts." *Eastley* at ¶ 21, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, fn. 3, 461 N.E.2d 1273 (1984).

{¶ 43} "R.C. 2151.414 sets out specific findings a juvenile court must make before granting an agency's motion for permanent custody of a child." *In re A.M.*, Slip Opinion No. 2020-Ohio-5102, ¶ 18. In cases such as the case sub judice, the juvenile court "must find by clear and convincing evidence (1) that one or more of the conditions in R.C. 2151.414(B)(1)(a) through (e) applies and (2) that a grant of permanent custody is in the child's best interest." *Id.*

16.

**{¶ 44}** Here, mother does not challenge the juvenile court's best interests analysis. Instead, she challenges the juvenile court's determination that permanent custody to LCCS was warranted based on its finding that C.S. could not be placed with mother within a reasonable time or should not be placed with mother under R.C. 2151.414(B)(1)(a), which provides:

(B)(1) Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:

(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's

parents within a reasonable time or should not be placed with the child's parents.

{¶ 45} As to a juvenile court's determination that a child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents, R.C. 2151.414(E) provides, in relevant part:

> If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:
>
> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.  In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to

the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

(2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code;

* * *

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child.

**{¶ 46}** The juvenile court found the above-referenced factors under R.C. 2151.414(E) applicable in this case. On appeal, mother argues that the juvenile court's findings under R.C. 2151.414(E)(1) and (4) were against the manifest weight of the evidence. She does not separately challenge the court's determination under R.C. 2151.414(E)(2), but that determination was based largely upon the court's findings under R.C. 2151.414(E)(1).

{¶ 47} Under R.C. 2151.414(E)(1), the court found that mother failed continuously and repeatedly to substantially remedy her substance abuse problem, which was the predominant issue that prompted LCCS's involvement in this case. The court found that, despite LCCS's provision of reasonable case planning services designed to help mother address her substance abuse, and notwithstanding mother's technical compliance with those services, mother's substance abuse continued throughout the duration of this case.

{¶ 48} At the hearing, LCCS presented evidence in the form of multiple urine screens that showed mother tested positive for THC and methamphetamines. In 2022 alone, mother tested positive for methamphetamines six times (July 26, August 3, September 27, October 14 and 19, and November 17), and tested positive for THC 12 times (March 24, June 2, July 26, August 16, 23, and 30, September 13 and 27, October 14, 19, and 27, and November 17).

{¶ 49} Notwithstanding these test results, mother argues that the juvenile court's finding was against the manifest weight of the evidence, because she was compliant with her case plan services and had completed nearly all of the services by the time of the permanent custody hearing. Mother's focus on her technical compliance with her case plan services is misplaced. Indeed, under R.C. 2151.414(E)(1), the crux of the analysis is not on the case plan services themselves, but on the desired effect of those services. The services are provided to the parent "for the purpose of changing parental conduct to allow

20.

them to resume and maintain parental duties." R.C. 2151.414(E)(1). As explained by the juvenile court below, remedying the conditions that led to C.S.'s removal from mother's custody required that mother actually stop abusing illicit substances, not simply that she attend a series of classes to learn about how to do so.

{¶ 50} Next, mother claims, as she did in the trial court, that her results for methamphetamine were the product of false positives stemming from her use of certain prescription drugs. However, mother introduced no medical records to substantiate this claim, and she called no expert medical witnesses to testify that her prescription drugs could cause a urine screen to yield a false positive for methamphetamine. Moreover, while mother's mental health records from Harbor acknowledge that her positive methamphetamine results "could be a false positive from over-the-counter Mucinex or other allergy medications," they also establish that mother was directed to "have lab work done here at Harbor as well as to have it sent out for confirmation" of that potentiality. There is no evidence that mother ever submitted herself for further testing to rule out the purported methamphetamine use.

{¶ 51} In addition to her argument concerning methamphetamine, mother contends that her positive test results for THC should be disregarded because marijuana use "was not at the heart of her substance abuse issue which caused the children to be removed." Mother cites no support for this claim. In essence, mother argues that because LCCS's referral was based upon mother's opiate use, and not marijuana use, the

21.

juvenile court should have limited its analysis to whether mother was still using opiates. However, the record reveals a broader concern from the outset; the issue of substance abuse in general was always at the heart of this case. Furthermore, mother's reliance upon her medical marijuana card as a justification for her marijuana use is without merit, since most of her positive urine screens were taken long before she secured a medical marijuana card.

{¶ 52} In sum, we find that the evidence in the record supports the juvenile court's finding under R.C. 2151.414(E)(1) that mother failed continuously and repeatedly to substantially remedy the issues that caused C.S. to be removed from her home, namely mother's substance abuse problem. Consequently, we find mother's first assignment of error not well-taken.

{¶ 53} Having concluded that the juvenile court's finding under R.C. 2151.414(E)(1) was not against the manifest weight of the evidence, we need not consider whether the court's finding under R.C. 2151.414(E)(4) was against the manifest weight of the evidence. As stated by the Ohio Supreme Court, "Once the trial court finds from all relevant evidence that one of the eight [R.C. 2151.414(E)] factors exists, it then must consider whether permanent commitment is in the best interest of the child. R.C. 2151.414(B)." *In re William S.*, 75 Ohio St.3d 95, 99, 661 N.E.2d 738 (1996). Stated differently, "[t]he existence of one factor alone will support a finding that the child cannot be placed with the parent within a reasonable time." *In re G.R.*, 5th Dist. Stark

22.

Nos. 2022CA00146, 2022CA00147, 2023-Ohio-1442, ¶ 53, citing *William S.* at 99; *see also In re C.N.*, 6th Dist. Lucas No. L-22-1194, 2023-Ohio-659, ¶ 53 (stating that the juvenile court "was only required to make findings under one subsection of R.C. 2151.414(E) to support its decision"). Thus, appellant's second assignment of error is not well-taken.

### III. Conclusion

{¶ 54} Since the juvenile court's finding under R.C. 2151.414(E)(1) is supported by the evidence, it needed only to consider whether an award of permanent custody of C.S. to LCCS was in C.S.'s best interest. Again, mother has not challenged the juvenile court's determination that custody of C.S. to LCCS was in C.S.'s best interest. Accordingly, we mother has failed to establish that the juvenile court's grant of permanent custody to LCCS was against the manifest weight of the evidence.

{¶ 55} For the foregoing reasons, the judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. Mother is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J.          _____

                                             JUDGE

Gene A. Zmuda, J.          

                                           _____

Charles E. Sulek, J.                              JUDGE
CONCUR.

                                           _____

                                             JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions. Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.